SOUTHWESTERN BELL TELEPHONE COMPANY *v.* LEE AND HANNA.

Nos. 4-5843 and 4-5844                    140 S. W. 2d 132

Opinion delivered April 8, 1940.

. *Bernal Seamster* and *Downie & Downie,* for appellant.

*Mallory, Butt & Rosier, John Mayes, G. T. Sullins* and *Rex W. Perkins,* for appellees.

BAKER, J. The two cases as above styled have been combined for disposition of the appeals in one opinion. The general facts in each case are very similar; the defense raises the same general issues in both cases. Whatever distinguishing characteristics there may be will be set forth in our discussion. In each case the appellees filed suits to recover penalties, as provided for in § 14261 of Pope's Digest, each charging that there had been discrimination by the telephone company against the plaintiff in not rendering the same flat rate service by the installation of business telephones, for which application had been made, as was rendered to other people or customers in like situation in the same com-

munity. Mrs. Lee was operating a cafeteria on the campus of the State University at Fayetteville. During the summer of 1938, in order to save expenses while there was no school in session she asked that her telephone be discontinued, or she be given the vacation rate, which meant that the telephone be disconnected, but not be removed, and that during that vacation she would pay a half-rate in order to retain the telephone she had been using and to keep her old or original telephone number. This arrangement, as we understand, would not in any way release her from her contractual obligation to keep the telephone, but was merely a convenient arrangement whereby she paid a half-rate without any service at all, but which assured her immediate connection upon her return at the beginning or opening of the University. On September 7th, at school opening, she asked that the telephone be connected and service be restored. The telephone company at that time refused to restore this service for the reason, it contended, there had been a new classification of telephone service; that the service that she had prior thereto in the use of her telephone, where it was then located, near her table or desk, or cashier's stand, was not then available at the old contract price of $3.50; but that such telephone, which was so located that students at the University who patronized her place of business might use it, would be put in service or operation again at a new rate of $10.50 per month. The company refused to connect up the telephone as then located without an agreement to pay that price. There was offered to her what was designated as a different class of service; that is to say, if she would permit the company to locate the telephone in her kitchen or conceal it under a counter, or put it in a show case, where it was not readily accessible for her patrons, the students, it would then be put in operation for the price of $3.50 per month, as the rental charge had been prior to her vacation. The telephone company says that she refused to agree to this. Her testimony was equally as positive that she did finally agree to this arrangement. She insisted, however, that she should have the same kind of service that she claims was rendered to other

business houses or concerns in the city, at the flat rate of $3.50, where customers of subscribers for the telephone service might make use of the telephone when they desired to do so. The company relied upon a rule which was offered in evidence and which has been identified as Rule C:

"Use of customer service.—Customer telephone service, as distinguished from public and semi-public telephone service, is furnished only for use by the customer, his family, employees or business associates, or person residing in the customer's household, except as the use of the service may be extended to joint users. The telephone company has the right to refuse to install customer service or to permit such service to remain on premises of a public or semi-public character when the instrument is so located that the public in general or patrons of the customer may make use of the service. At such locations, however, customer service may be installed, provided the instrument is so located that it is not accessible for public use."

Although Mrs. Lee agreed, according to her testimony, that she would abide by and conform to Rule C and permit the installation of the telephone under a counter or in a show case, the managing employees of the appellant company, in addition to the requirements of the rule, then demanded of her that she refuse permission to the students or patrons of her place of business to use the telephone. They say the reason they refused then to install the telephone is that she quite frankly told these managing agents for the telephone company that she would not deny or refuse the use of the telephone to anyone who might request its use as located either under a counter or in the show case and for that reason only they did not install the telephone.

This is not the first time that we have seen this rule, but it is the first occasion on which the requirements of the rule and the reasonableness thereof have been presented for our consideration. *City of Fort Smith* v. *Department of Public Utilities,* 195 Ark. 513, 113 S. W. 2d 100.

After mentioning the rule and the power of the department to enforce rules, we said: "We are not now concerned with the reasonableness of said rule and do not so decide."

We are by no means forgetful that appellant has argued the issues upon this appeal solely upon matters or questions of fact, asserting and assuming as they apparently have a right to do, under the record in this case, that because the reasonableness of the foregoing rule was not questioned by appellee, it may not properly be so considered in this litigation. This is so contended on account of the fact that both in the Lee case and in the Hanna case, counsel for the appellees have argued that the cases may be settled upon questions of fact duly presented without a consideration or determination on the part of this court of the reasonableness of the rule offered as a part of appellant's defense.

Ordinarily we would feel ourselves bound by such limitations as the plaintiffs themselves may have felt impelled to recognize in the decision of any rights they may have asserted in any matter wherein those rights were purely personal or individual.

In this matter, however, there are more than individual rights involved. The telephone company is a public service utility, having a monopoly of the service it renders in Fayetteville, where these suits originated, and whatever rules it may announce must be considered not as an all-controlling force, nor to possess the nature of a statutory enactment, but as regulatory merely, of the business of the corporation, and that such regulation must be considered as coupled inseparably with the public interest. Therefore, if rules are not reasonable they may not be regarded as enforcible or as affecting the rights of those who deal with the telephone company.

In this first case there is a sharp issue of fact, settled by the verdict of the jury as against the contention of the telephone company, its insistence being that Mrs. Lee refused every form of classified service that it tendered to her; that it offered to her the ordinary business phone at $3.50, to be secreted or hidden under a

counter, or in a show case, or in a box or cabinet which the company would provide at its own expense. Such instrument was for the exclusive use of herself and members of her family and her organization; that she refused to accept this service. On the other hand she testified quite differently, and the jury accepted her contention that she agreed to accept what is known to be the business telephone to be installed by the company at a place inconvenient for public use, but at some place near the cashier's stand, but refused to have it located in her kitchen, because of the fact that she had to remain at the stand and take care of the business and could not go to the kitchen or other parts of the building to answer the telephone without possible loss or interruption in her usual business transactions, or, unless she employed extra help in some respects in regard thereto. It is her contention that she misunderstood the arrangement whereby there was installed a telephone as she had had it prior to the summer vacation and that when she had determined that the price charged was $10.50 she immediately asked that it be removed and the ordinary business phone be restored at $3.50 and that she offered to comply with the reasonable rules and regulations of the company, even including the requirement that the telephone be placed under a counter, in a show case, or in a compartment. The dispute in this regard is that the telephone company insists now that it was not installed because she did not agree or promise to refuse permission to students to use the telephone in a new location, though she did agree to conform with all reasonable rules and regulations of the company. No examination of the foregoing rule will disclose that she should act as a guard for the telephone company to prevent the use of the telephone, nor is there anything in this entire record presented to us upon this appeal, indicating that there had ever been a grant of power to the agents of the telephone company to exact a promise from her, in addition to one to abide by the reasonable rules and regulations of the company, as a condition precedent to the establishment of a telephone in her place of business.

There is evidence on the other hand that there were other places of business in the city of Fayetteville, wherein business telephones were installed and freely used by the customers of the subscriber having the telephone. For instance, we are told that in the bookstore at the University, patronized by pupils, there was a telephone installed for their use and another near the working desk, or place of business of the owner for his individual use and that he paid for and the company accepted the monthly rentals for these two telephones.

There is evidence that other places of business, drugstores and other mercantile establishments had telephones accessible to their patrons and customers who would use them as might be convenient.

There was, no doubt, some telephones in use in the city of Fayetteville as were those in use at the bookstore, but, it is argued that such places have not yet been reached in the correction of such abuses by the enforcement of the rule above mentioned; that as new telephones were required and installed from and after the time of the adoption of the rule and its approval by the utility commission, no telephones had been installed except in compliance with the rule, and it is further argued that because of the fact that some subscribers violated the rule others were not justified in doing so. The company argues also that the telephone in the bookstore is not one operating under like situation as that demanded by Mrs. Lee, the distinctive characteristic being that the bookstore had operated its telephones and paid for this service for a period of six or seven years; and in some of the drug stores they had required that the telephones should not be located in places quite so convenient to the public as they had been during the years prior thereto. The full facts when developed show, however, that the standard business telephone in the town of Fayetteville was a $3.50 telephone, such as Mrs. Lee had had prior to the time of her vacation, such as had been operated in the bookstore, as a typical example, and other places of business in the city, one of which was a filling station. It is argued most earnestly in this case that these were not customers who were in like situation as that of Mrs.

Lee and who should have been dealt with as they were dealing with her. We have given full consideration to all matters that have been introduced upon the particular distinguishing characteristics which the appellant company has already presented by its somewhat voluminous briefs, also, by oral argument of counsel, and we have yet to find what amounts to a substantial difference in Mrs. Lee's cafe, where she had demanded a telephone, and in the bookstore, or the filling station. It is argued, and we understand it to be true, that Mrs. Lee's best customers were the students at the State University. We now suggest that there has not been abstracted in either one of the cases one line of testimony showing what the practice of the students at the University is in the use of the telephones. There is no proof whether they may have put in as many as five calls a day or five hundred. There is no proof in the entire record that the use of these telephones by the students tended to any extent, or any degree, to reduce, impair, or otherwise disorganize the telephone service, nor is there any proof that the free use of the telephone by any students added to the expense of the telephone company. In truth, if a presumption should be indulged, it must be against such a contention, for the reason that the telephone established in the bookstore was for the free use of the pupils and that there was no complaint made on account thereof, nor of any evil effects or consequences that may have followed the free use of the telephone by the pupils. It must have been available where it had been installed for that purpose in the bookstore, nor is there any evidence that the pupils used these telephones at any location to any greater extent, with any more frequency, or any less propriety than they used the telephone in the drug store or in the filling station.

We have considered these facts rather fully, giving full effect to the contentions made by the appellant and have come to the conclusion that the distinction or difference in the classification offered to Mrs. Lee or to Mr. Hanna, under the said facts must be determined from the undisputed testimony to be as follows:

The telephone company says three classes of service were offered to Mrs. Lee, but were not available to Mr. Hanna.

(1)   A telephone so located all her customers could make use thereof, where she desired to have it placed; a price of $10.50 per month was demanded.

This was the same telephone service that she had enjoyed prior to the vacation for which she had paid $3.50.   This was the same telephone service available at the bookstore, put in for the free use of the pupils, for which there was a charge of $3.50.   This was the same telephone service available at most of the stores and at business houses for $3.50 per month.   So this service may be regarded as the standard service of that community, one for which they charged everybody except appellees $3.50 and for which they were wanting to charge appellee, Mrs. Lee, $10.50.   The other classified service they offered her was the same kind of telephone, secreted in the showcase, under a counter, or in a compartment, furnished by the company.   This then was a sub-standard service for which they desired to charge this appellee $3.50.   The other was a coin box service which could be operated only by the deposit of five cents for each call. The owner of the place of business and the subscriber to this telephone had to guarantee a rate substantially the same as for the standard service, but he might get back as commission 20% over and above $3.30, the amount of the guarantee.   As explained, this coin box service was a kind of pay-call service, by which each person desiring to use the telephone paid to the telephone company for each call when made; and the owner of the place of business where it is installed furnished a place for installation, rent free.   These were essentially the facts in the Lee case.

We shall proceed now to state any particular facts relating solely to the Hanna case before stating our conclusions.

At the time the Hanna case was tried, appellant's witnesses testified that when they were negotiating with Mr. Hanna, he had a coin box instrument or telephone

in his place of business. He ordered it removed and this was on the last day it was in use. The agents for the telephone company testified that they offered to leave this telephone instrument in the place of business, upon the subscriber's guarantee of 11c a day, with further agreement that any amount received over $3.30 would be subject to a commission of 20 per cent, to be paid to the subscriber, but this was not satisfactory to Mr. Hanna. Mr. Jaggers, who says he was the commercial representative of the telephone company, stated "the $10.50 rate wasn't available at that time, but every available service was offered to the plaintiff." He was offered a coin box telephone or a flat rate telephone where it wasn't accessible to the public, but ordered the coin box telephone removed on that day, May 4th. At that time it must appear, therefore, that the telephone company had only two alleged types of service which it could offer to its customers, the one was the so-called coin box type, which cost five cents for each call made over it, and the other was the ordinary, conventional, regulation, or standard type, then in use at all business houses in the city, but the service which the company insisted upon impairing so as to make it less convenient for the public, and, of course, more inconvenient for the subscriber, if he accepted that type of service, and no choice was left to him, in that regard, for he must either take the coin box machine or the impaired standard service. The regulation or standard type service at three times the regular price, $10.50, had not then been conceived.

In appellant's briefs, the arguments stand out that the defendant distinguished the types of service rendered by the amounts paid therefor, and what had been and was the usual type of service, the kind that had been in use prior to that date as a kind of standard or conventional, or regulation service as had always been tendered to, and was used by all business houses was still in common or ordinary use, some businesses having as many as two telephones put in, one out in the open, easily accessible to the public, located and put in by the telephone company for the use of the public, established and paid for by the business houses. At the time of the trial, many

of these were still in use and operation, just as they had been for a number of years, and the principal distinguishing differences as between these so long in use and the kind demanded by Mrs. Lee and by Mr. Hanna was that those already in use had been there many years. The price for all of these was and had been for a long time $3.50 per month. Notwithstanding the fact that this was a recognized standard service, what was offered to the appellee was the use of exactly the same kind of appliance with exactly the same facilities as were employed in other places of business, a notable example of which was the bookstore, and notwithstanding the fact that the price had never been over and above $3.50, this same service was not extended to Mrs. Lee, except upon a contract for the payment of $10.50 therefor. The telephone company refused to restore this standard service for Mrs. Lee or for Hanna who were both engaged in the restaurant business, and who were patronized by students from the State University, unless these two subscribers who were demanding service would permit the telephone instruments to be installed in the kitchen or under a counter, or in a showcase or some place where it was inconvenient for the use of the public and in each of these instances inconvenient for the use of those who desired the service. The agents for the telephone company by their evidence argued that the standard type service, when installed is for the sole use of the subscriber, whom they call a customer, and the members of his family and his employees, or members of the business organization. They argue also that if such customer permits someone else to use the telephone he violates a contract made for the installation of the instrument. Such is the contention of the appellant company and because that condition was not upheld by the trial court, the appeal in these two cases is for the purpose of setting aside and overturning the judgments of the trial court. If under all the circumstances the contention is reasonable, based on a fair and natural classification of those who subscribed for and used telephones, we think it becomes our duty to uphold such contention as an established rule of the company, but, if, on the other hand,

the distinction or so-called classification is artificial, arbitrary and without any sound basis in fact, the law will not support it.

In the presentation of our conclusions reached upon a full consideration of all the matters presented in this record we say by way of premise, that not one line of testimony has been abstracted showing that telephones located in any place accessible to the students of the University had been subjected to any excessive use, not even the one located in the bookstore at the University, nor is there a word of testimony that a great number of calls over the telephone system would cost the telephone company any more than a few or half-dozen calls in the same length of time, nor is there a word of proof that even though the students at the University made frequent and constant use of the telephones that may have been so installed for their exclusive use, such use has ever impaired to any extent the uses or services demanded by others from the same utility. Therefore, we think that the contention of the telephone company and its local agents that each telephone is located for the sole and exclusive use of the subscriber, the members of his family, and his employees, unreasonable, inasmuch as it fails to give consideration to the physical properties or mechanics of the telephone as well as the usual and ordinary controlling purposes of those who install such instruments in their places of business. Telephones are not like typewriters or cash registers in a place of business, used only by those engaged there. Telephonic instruments belong to the utility and they are installed for regular monthly rentals or charges, and the full monthly rentals are charged and paid ordinarily without any deduction for "time out" or "bad order." This fact is mentioned because the telephone is a two-way appliance, a means of communication between two people widely, or actually separated from each other. The purpose is to furnish immediate contact, whether the parties are separated merely by a block or so or by a greater distance of a mile or more. It is presumed to be an open channel of communication every minute of the day and hundreds of calls would not consume or use up any part

of it, nor would this great number of calls tend to impair in the least the service.

Another interesting phase of telephone technique is wholly ignored by these agents of the telephone company and yet it is a factor upon which, to a great extent, the business of the telephone company must rely for its support. All that has been argued here, as a reason for the rule, is customers' service. A fine example of that would be in a home where a mother cares for several small children. She desires and demands a telephone so that she can call the doctor immediately, if needed, and also that she may do her shopping without leaving her children unattended, but the doctor she calls, or the grocer, or the meat market, or the milkman had their telephones installed, not for the calls they might want to make, but rather for the reason that they might receive the calls of those who desire their wares. We do not know what degree or percentage of people who install telephones, do so, so that their customers might be able to call them, but we venture to say a very large percentage of them do. While merchants and other businesses sometimes use telephones to call people in the transaction of business their controlling idea is to accommodate those who patronize them and to furnish to their customers an immediate means of communication so that they may profit by sales of their goods, wares and merchandise; so, it must appear that any limitation upon calls made over the telephone system is a limitation upon the service paid for by the ordinary business man who has installed the telephone to receive calls from those who want to buy his merchandise or by the doctor who wants his patients to be able to contact him immediately.

We think it must appear, therefore, that the agents of the telephone company who sought so assiduously to avoid rendering a free service to the University students are denying to a large number of the subscribers or patrons of the telephone company the right to receive calls no doubt contemplated. No University student ever put in a call, even though unauthorized by the customer subscribing for the telephone, without at the same time calling a number paid for by another customer and whose

telephone was perhaps installed for the very purpose of receiving such communications.

So it must, appear, we think, that the classification intended to be made by the telephone company, or its agents, is without a sound basis in fact or reason, and instead of rendering to new subscribers the same standard service that has been tendered to others and which each of these appellee subscribers has heretofore received for the price of $3.50 a month; and now to refuse that service except upon the payment of three times that sum, $10.50, is an unwarranted, unjust and unfair discrimination; or, on the other hand, so to impair that service by placing the telephone in the kitchen, or under a counter, or in a showcase, as to make it inconvenient to reach, and inaccessible, except by added trouble, and so to reduce what has heretofore been a standard, conventional or regulation service, and on account of that inferior and defective service charge what is regularly charged to all other business enterprises for a service not so hampered or impaired, must also appear to be a discrimination. Appellant company has cited for our consideration the case of *Southwestern Tel. & Tel. Co.* v. *Sharp and White,* 118 Ark. 541, 177 S. W. 25, L. R. A. 1915E, 323, as authority in this case. We accept the announcements made in that case which are to the effect that the telephone company has the right to make all reasonable rules and regulations for the operation and control of its business, and those who deal with it must comply with such reasonable rules and regulations, but this announcement may not be taken as an unlimited authority on the part of the telephone company to announce a rule the effect of which would result in reducing, impairing, or rendering an inferior service with the same appliances and facilities used in rendering the standard or regular service, and thereby defeat the effect of regulatory statutes. The public has the right to demand and receive the best available service and no public utility has the right to choose, arbitrarily, to render an inferior service, or a substandard service merely to inconvenience those from whom they are unable to exact potential fees or charges that might otherwise be collected. It is possibly true, we

do not know, that the student body at the State University is a potential source of revenue to the telephone company, if it could so regulate its business affairs that it would be able to collect from those who temporarily reside in University quarters, but that fact furnishes no basis or reason to deny an equally efficient service to those engaged in business there, because their principal customers are students of the University, nor may they require such business people to collect from the students the potential income they are otherwise unable to get by usual and approved methods of dealing.

It is argued that the bookseller, or the filling station operator is not one in like situation with either of the appellees in this case. It is true that perhaps no two places of business in the city of Fayetteville are identical in all respects and that if the term "in like situation" be pursued to an ultimate conclusion, then every business house in the city of Fayetteville would form a separate and distinctive class. The statute (Pope's Dig., § 14261) intended no such specious reasoning. The organization operating the telephone system in Fayetteville must not be forgetful of the fact that the State University is the city's greatest institution; that without it few telephones would be in use, and that those who now pay their regular monthly sums for the maintenance and support of this telephone system would no longer need to do so.

This is not the first occasion upon which we have given consideration to the rights of the subscriber or user of the telephone in his relation to other subscribers or users. Indeed, in a recent case the principal complaint was that the plaintiff was the object of a discrimination in that he was denied the use of some of the facilities of the telephone company, though he was given the right to a physical connection or right to make calls over the telephone system. After having copied in full § 14261 of Pope's Digest, we said:

"It does not answer the requirements of the law, we think, merely to extend to one who has applied for service, telephone connection only. The telephone

company has made us conscious of the facilities within its control, of directory value and proper listing of subscribers, not according to consecutive numbers, but by an alphabetical arrangement of names, so that any particular person or business concern, among all of the subscribers or users of the telephone service, may be promptly reached without undue trouble or delay." *Southwestern Bell Tel. Co.* v. *Matlock,* 195 Ark. 159, 111 S. W. 2d 500.

Other remarks in the same opinion no less pertinent, we think, deny the right to anyone who recognizes the telephone as an instrument whereby the subscriber or customer may be reached or called rather than one for his exclusive use in calling other persons. In truth, we held in that case that discrimination might consist in a refusal to list in the directory one who made proper application therefor, provided that one was willing to abide by reasonable rules and regulations of the company.

Such was the decision of this court in the Yancy case. In that case, although Mr. Yancy had a residence telephone, he was required to go to the central office of the exchange and pay cash in advance before it would permit him to use long distance communication. It was also held in that same case that the telephone company could exact pay in advance as was decided in the Sharp and White case, *supra. Yancy* v. *Batesville Tel. Co.,* 81 Ark. 486, 99 S. W. 679, 11 Ann. Cas. 135.

So the discrimination determined in that case consisted in failing to render to Yancy the same service available to others, a discrimination in quality or kind of service, but not because of any effort to make sure of payment therefor.

In the cases discussed, as in this opinion so far, we have given due emphasis to the fact that the customer or subscriber for service must evince a willingness to conform to or abide by the reasonable regulations or rules of the company. In this regard we call attention to two matters. The rule in this case was one that was promulgated by the company, though the

appellant argues that it is a rule of Department of Public Utilities. There were rules and regulations promulgated by such utility corporations before such commissions were functioning and these were no less binding than the ones promulgated at the present time, even after the approval of the commission. *Southwestern Tel. & Tel. Co.* v. *Sharp and White, supra; Yancy* v. *Batesville Tel. Co.*, 81 Ark. 486, 99 S. W. 679, 11 Ann. Cas. 135.

The point we now make is that such regulations may not be ignored but must be observed by the corporation proclaiming them. The corporation certainly may not ignore such rules as to some customers and observe them as to others. If any rule may be so enforced, then the telephone company has the power to abrogate and nullify statutes intended to prevent discrimination. Certainly, if the telephone company elects to enforce a rule, only as to those who may apply for service after the adoption of the rule, there arises at once a discrimination as between those who already have it and the new subscriber or applicant.

There is little force in the argument offered in defense that the company may not be able to change all telephones immediately, but a reasonable time must be given within which the changes will be made as they are reached in the usual and ordinary course of business. However reasonable the argument may sound, it violates well known practical operations of all telephone companies. Most of us have seen storms break down telephone lines, sleet and ice almost totally disrupt the service, yet within a few days the entire system be reworked and restored to ordinary capacity. In truth, the evidence in this case shows that the two businesses are the only ones who have been denied service, not solely because they refuse to abide by the rules, but because the telephone company exacted more of them than the rules required—express promises that they actively seek to prevent the use of the telephone by any non-subscriber. Such was the declaration of the witnesses in the Lee case, and surely no other conclusion can be reached from the proof.

In the Hanna case, the telephone company had determined that Hanna should continue in the use of the coin box instrument. It had not then conceived the idea of a triple charge for the standard business telephone installed at a place selected by the customer or subscriber. There is no proof of another instance like this in the city of Fayetteville.

In a recent case, we held that a telephone company might not make unreasonable requirements as a condition precedent to the rendition of service. *Southeast Ark. Tel. & Pow. Co.* v. *Allen*, 191 Ark. 520, 87 S. W. 2d 35. We said therein: ''Appellee offered to comply with this rule. He says he was prevented from doing so by a requirement that he surrender his right to sue for penalties accruing to him by reason of alleged discrimination. The telephone company did not have a right to require him to yield or surrender any claim for penalties as a condition upon which it would render him the service.''

There is some evidence that in a few instances the telephone company has, by permission, moved some instruments and placed them in showcases or under counters, but there are other instances wherein there is the patent disregard by the company for the alleged rule in that there is the establishment and maintenance of telephones for public use in many business houses.

Besides the fact we think appellant's classification is arbitrary and artificial, we also hold that any interpretation of the rules adopted which permits discriminations or apparently furnishes an excuse therefor by way of defense is in violation of the appropriate statute. Section 14261, Pope's Digest.

It follows that the judgments in both cases should be affirmed.

It is so ordered.

SMITH and McHANEY, JJ., dissent.