SOUTHWESTERN BELL TELEPHONE COMPANY *v.* MATLOCK.

4-4851

Opinion delivered December 13, 1937.

160

*Gorden E. Morrow, Smith B. Atwood* and *Blake Downie,* for appellant.

*June P. Wooten,* for appellee.

BAKER, J. The judgment from which this appeal comes was rendered in the circuit court in a suit for penalties under the provisions of § 10251, Crawford & Moses' Digest, now § 14261 of Pope's Digest, wherein there was an alleged discrimination in failure and refusal to render telephone service to the appellee, an attorney.

Frazee & Chester had offices in the Southern building at Little Rock and occupied a suite of three rooms. They rented one of these rooms to Matlock, who made application to the appellant company for telephone service to be rendered under what is known or termed in telephone parlance as "joint user" service, that is to say this application was such that it was made by Frazee & Chester who were already subscribers to permit Matlock to be listed as a subscriber having the use of the telephone of Frazee & Chester and to be so listed as having the same telephone number. We do not understand that this contemplated necessarily an extension of another instrument, though it may have done so. That matter has not been fully developed, and in the view we take of this case is immaterial.

A statement of the facts as they may have been reasonably found by the jury without a detailed statement of the evidence will be sufficient. However, should any matter of evidence be necessary to be stated in this discussion such statement will be inserted as may be required for the understanding of the issues. It will perhaps somewhat simplify this discussion by referring to the appellant as the telephone company and to the ap-

pellee as Matlock, or appellee, and to Frazee & Chester as the main subscriber.

At the time of the application for the telephone service, Matlock had made arrangements with the main subscriber to occupy one of the three rooms of the suite. He desired telephone service. The telephone company was advertising the fact that its list, for its next directory, would be closed on November 25, 1935. On November 24 Matlock went to the telephone office, applied to the proper desk or office for this service, told what he desired and an employee, a lady in charge of the office, used one of the blank forms prepared by the telephone company, filled in the blanks necessary to obtain the service desired and directed Matlock to take it to the main subscriber, Frazee & Chester, for the signature of this main subscriber. It is stated and not disputed that this application had no blank for Matlock's signature, and it was not contemplated that one making the demand for this service should sign any application. The main subscriber was regarded as sole applicant for this joint user service. Matlock was directed that, after this application had been signed by Frazee & Chester, it should be returned to the office or desk from which he had obtained it. The application was duly signed by the main subscriber, and it was also signed by Matlock, who delivered it on November 25 as he had been directed to do the day before.

It is argued by the telephone company and we presume, because the application was so prepared, that the telephone company was not interested in Matlock, or, in such instances, in the party who would make joint use of the telephone, as this service was made available upon the application of a main subscriber only, who became responsible to the telephone company for all additional charges that might be rendered incident to the joint user service; that no account was to be made or charged to Matlock, or other such parties for whose benefit, or in whose favor, joint user service might be extended. Upon the return of the application signed by the main subscriber, and, also, signed as above stated

by Matlock, who had delivered this paper in person, Matlock was asked to wait a moment; then during this interval the employee in charge made an examination of records available. After her examination she advised Matlock that she would not be warranted in granting this service because the telephone records disclosed the fact that he was then indebted to the telephone company in a sum of money of $14.77, and that before the service applied for could be rendered this bill would have to be paid or satisfactory arrangements be made for its payment by installments. Matlock insisted the representative of the telephone company should note upon the application that it was rejected. The agent of the telephone company insisted that he should see Mr. White, her superior, but he was not available just at that moment. She then noted upon the application the following: "Unpaid bill of $14.77 of Mr. M. A. Matlock. I do not feel justified in listing name in January 1, 1936, directory until bill is paid or satisfactory arrangements made to pay it on installments." No objection was made because Matlock's signature was not required or unnecessary, but the demand was refused because Matlock was the party who would make joint use of the telephone facilities. She returned to Matlock this application and he took it away. When the new directory was issued on January 1, 1936, Matlock's name was not listed among the subscribers. He perhaps did not expect it to be listed, but immediately after the issuance of the directory he wrote the telephone company and called attention to the fact of his application, and the failure to grant him the joint user right with proper listing.

A short time thereafter, Mr. White, representing the telephone company, called at the office of the main subscriber, where he says that the room occupied by Matlock was separated from the other two rooms or offices occupied by the main subscriber; the connecting door being closed and locked. A desk with books thereon was placed against this door effectually closing it. He testified that he called Matlock's attention to this fact, and consequently that he was not entitled to the joint user

service because this service is extended only to those who occupy the same room, or office, or office suite. Later on, however, perhaps in February, he again visited the office of Matlock and at that time offered to grant the joint user service, upon what was termed "informational listing," that is to say, that the information department of the telephone company would list the name of the appellee so that, when he was called for, "Information" would give the correct number so that the person calling might call the proper number to reach the attorney. This was declined and Mr. White urges that Matlock advised him at the time that he preferred to wait out the period within which he should have been listed and sue for and recover such penalties as are provided by law for the alleged discrimination in the failure or refusal to grant to him the telephone service asked for. A verdict was rendered for $100 and $5 a day from January 1, 1936, the date on which a new directory was issued. Before the suit was tried Matlock, by letter, again made demand of the telephone company for this joint user service, including listing in the directory, and in what is called the "classified section" or yellow sheets of the new directory to be issued September 1.

Upon the issuance of the September directory, it was found that Matlock's name was listed properly, except that it did not appear in the "classified section." His complaint was amended, alleging this failure or refusal on the part of the telephone company to place his name in the classified list as a further discrimination or refusal to give him the same service yielded to others in similar or like situation. It appears that the matter suggested in this amendment was submitted separately from the main issue, and that it was decided adversely to Matlock. It is argued, however, by the appellee that the failure of the telephone company so to list his name in the classified list, though it was otherwise listed, was additional evidence supporting the contention made by the appellee that the conduct of the telephone company was willful. On account of the fact that we prefer, however, to treat the verdict of the jury, in favor of the ap-

pellant in that particular matter, as completely foreclosing appellee from making any deductions from this part of the suit favorable to his contentions as now made, no further consideration will be given to that matter as there is no cross-appeal by appellee.

The telephone company insists that the court should have directed a verdict in its favor for two reasons. First, that the appellee did not establish his case of discrimination in that he did not leave on file his application after it had been refused, and that there was, therefore, no contract between the main subscriber and the telephone company of this joint user service, as the application had been wrongfully withdrawn, and, second, that the statute which now appears as § 14261 of Pope's Digest was repealed by act 324 of the Acts of 1935 which created the department of public utilities and vested in that department sole jurisdiction to determine disputes over tariffs, service, etc.

There are some other questions that arise incidentally and one is that, although this service as applied for was to begin on January 1, 1936, there were ten days' grace allowed by law after that date within which the service might be arranged for, and another contention is to the effect that even though it should be determined appellee was entitled to penalties, they could not continue after the date in February when Mr. White, representing the telephone company, offered to the appellee this joint user service with the informational listing.

It is argued with considerable vigor that the attorney was more interested in placing himself in a position to secure and collect penalties against the telephone company than he was in procuring a joint user service as applied for. We appreciate the fact that counsel are justified in making whatever deductions they feel impelled to make from the record before them in order to present fully and clearly upon appeal the main issues of the controversy they desire to have us review. These deductions or conclusions of counsel are sometimes helpful in placing a proper value or estimate upon matters relating to the main issues under consideration, but

counsel, we think, are fully advised that, most frequently, such conclusions or deductions have been determined and foreclosed by the verdict of the jury. However, that may be, we have given to these due consideration in an effort to appreciate understandingly all matters presented.

From the foregoing it is seen that there is no denial of the fact that the telephone service applied for was not rendered, nor was there any offer to render any service as applied for until in February, 1936, which will be discussed later in this opinion. It must also have appeared as significant that the defense offered by the telephone company to this charge of discrimination in its refusal to render service was not the fact that Matlock was indebted, and did not pay the $14.77 as requested by the telephone company as a condition precedent to the rendition of service. No explanation is made as to why this defense of alleged unpaid indebtedness was not made. But it was a matter that necessarily appeared in the trial of the case as an explanation of the refusal to accept the application for the joint user service.

It is urged most forcefully that Matlock did not leave on file the application made by him, but that he took it away and that the telephone company had a right to assume that the application was withdrawn. This, of course, was the main issue of fact presented to the jury for its determination and it does not appear to us now as a matter of law that we could properly say, under the circumstances presented by the abstract and briefs of appellant, that Matlock voluntarily withdrew his application for service. His contention is that the written refusal was final and the jury might properly have so found. It was by this written notation upon the application, made by one having authority to make it, the telephone company declined to consider the demand made, a refusal so positive that even the application was surrendered to Matlock for whose benefit the application was offered.

If it were the intention of the telephone company, acting through its authorized agent, to settle the matter

with that act of finality, imported by the writing upon the application, then there could be no purpose or reason for further attempt to file the application or leave it with the telephone company and more particularly is this true when appellee contends that after the notation was made upon it, it was returned voluntarily to him. The jury might have found, as it most probably did, that Mr. White was justifying the position taken by the telephone company when he determined upon his first visit to the office occupied by Matlock, that Matlock was not entitled to the joint user service. In any event, this was one of the principal defenses offered upon the trial. It was met, however, by evidence contradicting that of Mr. White and which was accepted by the jury.

The next matter we prefer to discuss, as it appears to come naturally in chronological sequence, is the contention that "joint user service" through the information department was tendered in February and that this should be conclusive as to the time within which penalties might properly be imposed. The applicable statute is as follows:

"Discrimination—penalty. Every telephone company doing business in this state and engaged in a general telephone business shall supply all applicants for telephone connection and facilities, without discrimination or partiality, within ten days after written demand therefor; provided, such applicants comply or offer to comply with the reasonable regulations of the company, and no such company shall impose any condition or restriction upon any such applicant that are (is) not imposed impartially upon all persons or companies in like situations; nor shall such company discriminate against any individual or company engaged in lawful business by requiring as condition for furnishing such facilities that they shall not be used in the business of the applicant, or otherwise, under penalty of one hundred dollars and five dollars per day for each day from the expiration of such notice until said demand is complied with or suit is instituted for failure to comply with such demand,

for such discrimination, after compliance or offer to comply with the reasonable regulations and time to furnish the same has elapsed, to be recovered by the applicant whose application is so neglected or refused. Any person denied such telephone facilities shall also have the right to proceed by mandamus or other proper remedy to enforce the furnishing of same, and the courts shall hear such applications either in vacation or term time and make such temporary orders relative to the furnishing of such facilities as the facts may justify and may enforce compliance therewith until such orders are vacated by order of the court or judge at chambers, or such suit is finally determined.''

The contention, as argued, is perhaps not well taken. There is little about the foregoing copied statute that could be construed. It does not answer the requirements of the law, we think, merely to extend to one who has applied for service telephone connection only. The telephone company has made us conscious of the facilities within its control, of directory value and proper listing of subscribers, not according to consecutive numbers, but by an alphabetical arrangement of names so that any particular person or business concern, among all of the subscribers or users of telephone service, may be promptly reached without undue trouble or delay. We have also been made conscious of the fact that rates are fixed and determined by the amount of service the company has to offer, and its facilities are not confined to a mere physical connection of the subscriber's telephone to the exchange. The value and importance of telephone service is determined by the number of subscribers that may be available. The company will not be permitted to set forth these facilities as available to its subscribers and then furnish them to some and deny them to others. These facilities are as much within the purview of the statute as is the physical connection with the exchange station. We think it may be said, without any contradiction, that the telephone connection without facilities is almost as worthless as facilities without the connection.

The form and substance of the application must be held to have been sufficient, prepared as it was by the company's agent, upon a blank furnished by the telephone company. The alleged indebtedness or failure to pay same was not pleaded as a defense or relied upon in any particular, though, if true, it might have been a good defense, if such payment were required as a condition precedent to rendition of service by a reasonable rule of the utility. *Danaher* v. *Telephone Co.*, 94 Ark. 533, 127 S. W. 963, 30 L. R. A. (N. S.) 1027; *Telephone Co.* v. *Danaher,* 102 Ark. 547, 144 S. W. 925; 238 U. S. 432, 35 S. Ct. 886, 59 L. Ed. 1419, L. R. A. 1916A, 1208; *Yancy* v. *Telephone Co.*, 81 Ark. 486, 99 S. W. 679, 11 Ann. Cas. 135; *Southeast Arkansas Telephone & Power Co.* v. *Allen,* 191 Ark. 520, 87 S. W. 2d 35.

There was no refusal to be bound by the reasonable rules of the utility.

It is argued that this § 14261 of Pope's Digest was repealed by the act forming the Department of Public Utilities, No. 324, Acts of 1935. It is not contended that there is an express repeal, but that the repeal is by implication. The argument offered in this respect is far from convincing. We do not find that there is any re-pugnancy or such contradictory terms or conditions that the older statute must be regarded as displaced by the new regulatory act. It is true the Department of Public Utilities is empowered to consider many phases of the activities of public utilities, but it is likewise true that the power is regulatory in its nature as affecting the public generally and not intended to settle controversies that arise between the individual subscriber or applicant for service and the utility. In fact it appears to us more reasonable to assume that the new act was drawn and put in force with the idea that it should be considered as cumulative of practically all the other regulatory enactments except those directly and expressly repealed. Such a conclusion is impelled by a consideration of § 63 of act 324 which provides that penalties provided for in said act are cumulative of all other penalties otherwise provided for.

It is urged further that the court erred in permitting the jury to consider the full time between January 1 and September 1 as the period of delinquency within which the penalties attached, for the reason that the statute gives ten days after written demand therefor. We think the complete answer to this controversy is the fact that this application was made on November 25 for service to begin on January 1.

The only questions presented upon this appeal in regard to instructions under which this case went to the jury arose by reason of the fact that the appellant insisted that the court should have directed a verdict in its favor, and that it was, therefore, error to give any instructions. There were issues of fact properly determined by the jury.

We, therefore, presume that all matters of liability were properly submitted to the jury and settled by the jury's verdict. The case will, therefore, be affirmed.

GRIFFIN SMITH, C. J., dissents.

GRIFFIN SMITH, C. J., (dissenting). The facts in this case do not, in my view, establish liability of the appellant, for the following reasons:

One room of a suite of three, comprising the offices rented by Frazee & Chester as public accountants, was made available to appellee with an agreement that, subject to requirements of appellant as to service connections, appellee should have use of the telephone facilities contracted for by Frazee & Chester. When appellee applied personally to appellant, he was told by Miss Harville that the Telephone Company would require an application to be signed by himself and Frazee & Chester, the latter being designated as the primary customer. A blank form was given appellee, who returned the following day and tendered it, signed by the required parties. This occurred November 25, 1935. It was the last day for listing subscribers whose names were to appear in the directory to be published January 1, 1936.

Appellee testified that when he tendered the executed application to Miss Harville, she told him it had just been ascertained by her that appellee owed an old account

of $14.77. According to appellee's testimony, this conversation occurred:

"I said then, 'You are refusing to accept the application?' Well, she didn't say exactly she was refusing it, but she said she couldn't accept the application to furnish service until the old bill was settled or arrangements made for it. 'Well,' I said, 'just write across the face of the application that it is rejected.' She said, 'No, I cannot do that.' 'Well,' I said, 'Do something with it, because I am tendering the application here—because I want the service.' She seemed a little dazzled herself about what to do about it. . . . She then agreed to write, and did write in the body of this application this memorandum: 'Unpaid bill of $14.77 of Mr. M. A. Matlock. I do not feel justified in listing name in January 1, 1936, directory, until bill is paid or satisfactory arrangements made to pay it on installments.' She handed this application back to me. . . . I took the application back to the office and filed it there—just kept it."

Miss Harville testified that she is the business office representative of the Telephone Company in Little Rock, and reports to Mr. White, the local manager, and to Mr. McCall, the district manager, who are her superiors. Her duties embrace the clerical work of taking orders for new telephones, and orders for moving telephones. When appellee first visited the office, he stated that he only wanted to get the rates, and was not ready to place an order. Witness suggested that she be allowed to prepare the form, which she did, and gave it to appellee. When appellee returned the following day witness found the old record showing that appellee owed an unpaid balance. A discussion ensued and witness told appellee she did not feel that she could take the order "unless the bill was straightened out." She suggested that appellee talk with Mr. White, and appellee said, "No, that is not necessary. If you don't want to give me the service, just write it on the paper." Witness told appellee she didn't see why it was necessary, but he insisted. She again insisted that appellee see Mr. White, but he said, "No, that isn't necessary." Wit-

ness told appellee that Mr. White was more familiar with the subject than she, but "He seemed to be in a terrible hurry. Mr. White wasn't in the office and I told him (appellee) if he didn't want to wait and locate Mr. White that I would be glad to have him call him or get in touch with him. He said that would not be necessary."

Miss Harville further testified that she had never handled a case of this kind before.

On cross-examination, appellee testified that Miss Harville discussed with him a rule regarding payment of back bills.

"Q. It was in that connection you say she didn't exactly refuse the application? A. I think I said something to that effect—that she refused to write across the face of the application, 'refused.' I asked her to write 'application denied,' and that she refused to do. From that day until January 1, I made no further mention of the fact."

There is little, if any, conflict in the testimony.

It is quite clear that when appellee applied to Miss Harville the day before he says his application was rejected, he wanted some kind of telephone service, but was not sure what it was. The service he finally selected and requested would have cost $1 per month. If the account presented by the Telephone Company were correct, he then owed more than the company, under the proposed arrangement, would have collected in fourteen months. By his own testimony, appellee was not insistent in his service demands after being apprised of the old obligation. The effect of Miss Harville's conduct and statements was to advise appellee that in the peculiar circumstances presented, she lacked authority to finally pass upon the application, which was not, in a legal sense, rejected. Having been told by Miss Harville that she was without such authority, and having, as shown by his own testimony, recognized the limitation, appellee was in no sense justified in urging Miss Harville to make an indorsement contrary to what she had told him, he at that time having in mind a purpose to take advantage of

a technical situation brought about by a process of "dazzling," as appellee expressed it.

In *Southwestern Tel. & Tel. Co.* v. *Danaher,* 102 Ark. 547, this court held that it is not a reasonable regulation for a telephone company to refuse to furnish telephone connections to one until he pay a debt contracted for service rendered in the past which he claims he does not owe. From such adverse ruling, the appellant Telegraph and Telephone Company appealed to the Supreme Court of the United States, and there the judgment was reversed. The court said: "While it is not open in this court to revise the construction placed on a statute by the state court, it is open to determine if the application of the statute as so construed is so arbitrary as to contravene the fundamental principles of justice as to amount to a deprivation of property without due process of law. (2) The rates of public service corporations, such as telephone companies, are fixed in expectation that they will be paid, and reasonable regulations tending towards prompt payment are necessary, as the ability of such corporations to serve the public depends upon prompt collection of their rates. (3) Collection of such rates by legal process being practically prohibitive, regulations requiring payment in advance are not unreasonable, and a telephone company is not subject to penalties for refusing to render service to a subscriber who is delinquent on past rates and refuses to pay in advance in accordance with the established rule uniformly enforced, or because it charges the full price to a subscriber who does not pay in advance while allowing a discount to those who do pay in advance. (4) To enforce against a telephone company a penalty for refusing to furnish service under such conditions amounts to depriving it of its property without due process of law in violation of the Fourteenth Amendment." *Southwestern Tel. & Tel. Co.* v. *Danaher,* 238 U. S. 482, 59 L. Ed. 1419, 35 S. Ct. 886.

The penalties provided by § 10251, Crawford & Moses' Digest, were never intended to apply to a situation wherein the so-called "refusal" was expressed in

the manner shown here, by an employee who coupled with her declination an explanation that she was without authority to proceed—a statement appellee has not shown to have been untrue, and one he himself must have recognized as being supported by common sense, as opposed to a trifling legal technicality.

The result of affirming the judgment for $1,350 supplies appellee with funds sufficient to pay in advance for the kind of telephone service requested, over a period of one hundred twelve years and six months, not counting interest on the fund in hand. If the proceeds of this judgment should be loaned at six per cent. per annum, it would earn $81 per year, or enough to pay for six telephones with a cash balance of nine dollars left over.