Appellant's second motion for rehearing is overruled.

**SOUTHWESTERN BELL TEL. CO. v.
TEXAS STATE OPTICAL.**

No. 4800.

Court of Civil Appeals of Texas.
Beaumont.

Oct. 23, 1952.

Rehearing Denied Nov. 19, 1952.

King, Sharfstein & Reinstra, Beaumont, for appellant.

Cecil, Keith & Mehaffy, Beaumont, for appellee.

WALKER, Justice.

This proceeding is a suit to compel the Southwestern Bell Telephone Company to list the name of a telephone subscriber under a heading in the classified section of the telephone directory issued in Port Arthur, Texas.

The plaintiffs are the appellees. They are Dr. N. Jay Rogers and Dr. S. J. Rogers. They are licensed optometrists and practice their profession as a partnership, of which they are the sole members. This partnership is also engaged in business as opticians. To this partnership plaintiffs have given the trade name "Texas State Optical", and they have operated their partnership under this trade name for many years. Plaintiffs requested defendant to list this trade name under the heading "optometrists" in the classified section of the Port Arthur directory and defendant refused to do so. Plaintiffs then brought this suit.

The appeal is from an order granting plaintiffs a temporary injunction which, in effect, would require defendant to make the listing requested had it not been suspended pending the appeal. The order recites that all issues of fact were found in plaintiffs' favor. The evidence supports the facts hereinbefore stated and the following conclusions of fact:

A copy of the last Port Arthur directory issued before the suit was filed is in evidence. This is a printed booklet of 396 pages, in two sections, and it is bound under one cover. It is copyrighted, and a statement that it is copyrighted appears at the foot of page 1 of the first section.

This directory contains the names of the subscribers to the telephone exchange operated by defendant at Port Arthur. Mr. West, District Manager for the defendant, testified that defendant had about 25,000 subscribers in Port Arthur.

A copy of this directory is distributed by the defendant to each of the Port Arthur subscribers. No extra charge is made for this directory and one copy is issued to the subscriber for each telephone that he has. The directory is not distributed to persons who are not subscribers to the Port Arthur exchange.

This directory is compiled by the defendant from information contained in its own records. It is apparent that defendant has at least a virtual monopoly of the service rendered by this directory.

The purpose of the directory is to enable the subscribers to communicate with one another over the telephone. It would be impossible for them to make any worthwhile use of their telephone without a directory unless the defendant employed persons to answer requests for telephone numbers unknown to the particular subscriber and the directory thus helps not only the subscriber; it clearly facilitates the operation of the defendant's own business. Mr. West testified:

"Q. The main purpose of the directory you put out is to enable people to use the telephone? A. Our directory that is compiled from that is an adjunct to the use of the telephone, yes.

"Q. Without the great majority of the people using the telephone directory you couldn't function as a telephone company, could you? A. It would be pretty difficult.

"Q. I'll ask you if it wouldn't be almost impossible? A. Highly impractical."

The first section of the directory is printed on white paper and contains 132 pages, numbered 1 to 132. The back of the front cover and the first two pages contain information about matters pertaining to the use of a telephone. The next 127 pages are an alphabetical list of the subscribers whose telephones are connected with the Port Arthur exchange. Of the next three pages, two contain requests and admonitory state-

ments addressed to all subscribers of the defendant's, and on one page is an advertisement of the classified section of the directory. This first section of the directory is printed on white paper.

The second part of the directory is the classified section. It covers 244 pages, numbered from 1 to 244, and is printed on yellow paper. It contains an alphabetical list of trades, businesses, professions, occupations and callings, and under each of these titles is an alphabetical list of persons who follow that calling. Many advertisements like those in newspapers or a merchant's catalog are printed in this section, and if the advertiser's name is printed in a list of names in this section, his advertisement is referred to by the following words printed under his name: "(See Advertisement This Classification)".

These classified lists are also intimately connected with the alphabetical list of subscribers otherwise than by being bound under the same cover; classifications are also made in the alphabetical list of subscribers. For instance, if the subscriber listed there is a physician, the abbreviation "phy" appears after his name. The classified section contains several titles under which physicians are listed; the general title is "Phys & Surgs—M.D." Optometrists are also identified in the alphabetical list of subscribers in the same way, and so are dentists, chiropractors, and at least some of the attorneys. There may be other classifications in the alphabetical list of subscribers, but we have not extended our search beyond the professions we have mentioned.

The general public is not admitted to the directory, and the only names printed in the directory are those of telephone subscribers or persons who are authorized to list themselves as using the subscriber's telephone. For instance, optometrists who are employees of plaintiffs are listed under the title "optometrists" in the classified section, just as plaintiffs themselves are and as "Texas State Optical" is. However, listings other than those of the subscriber's name are classed by the defendant as additional listings and extra charges are made for printing these in the alphabetical list of subscribers and in the classified section.

Defendant has printed a number of advertisements in the classified section which are directed to persons who use a directory and these advertisements point out the advantages and the values of the classified section to such persons. Use of the classified section is facilitated by printing it on paper colored differently from the paper containing the alphabetical list of subscribers, and these advertisements refer to the classified section as the "Yellow Pages", the color of the paper on which it is printed. The following statements are typical of the advertisements made by defendant in the classified section: (a) "Look in the Yellow Pages before you call the store or repairman;" (b) "One call may do the work of two. If you check business numbers first in the Yellow Pages." (c) "Who handles that brand? Many widely advertised products are listed in the Yellow Pages;" (d) "Won't you join our 'T' party? Save Time, Travel and needless Telephone calls. Look in the Yellow Pages before you make your business call;" (e) "Who Sells What and Where is he? Let the Yellow Pages tell you—and save time, travel and *needless* telephoning;" (f) "Save needless steps! Find names, addresses, telephone numbers in the Yellow Pages;" (g) "Most dealers and producers are listed in the Yellow Pages;" (h) "Are They Open Evenings? Look in the Yellow Pages. Many firms show their business hours, products, services, and other information;" (i) "In a hurry? Use the Yellow Pages;" (j) "Let the Yellow Pages be your shopping helper;" (k) "Shopping is as simple as A-B-C if you use the Yellow Pages."

The facts stated in these advertisements of defendant's, the economic status of the persons who subscribe to telephones, and the fact that each subscriber possesses a copy of the directory explain why the classified section of the directory is almost twice as thick as the alphabetical list of subscribers and why such a multitude of persons list their names and advertise themselves and their calling in this section. The economic status of that part of the popula-

tion which subscribes to telephones is generally better than that of persons who do not subscribe. The telephone directory, including the classified section, is available to every one of these subscribers and to such other persons as may use a subscriber's telephone, and it is obvious that a person who does use a subscriber's telephone and who does not have the name of some particular person in mind will probably use the classified section to find out the name of some person who can render him the service he wants. The truth is that the classified section of the telephone directory. has become of great value and utility to all telephone subscribers because it furnishes them with necessary information, most of which is not otherwise available to them and certainly not so conveniently at hand.

The consequence is that a business or a professional man who is allowed to list his name in the classified section has a more valuable telephone than one who is not, and if the defendant undertakes to exclude a subscriber from this section while admitting his competitor, the injury to the first and the advantage to the second would be material and might constitute a form of oppression. Of course, the classified section is not absolutely necessary to the use of the telephone—but it does make the telephone of any subscriber more valuable to *him* because of the information which the defendant has collected and put into the classified section and made available to him.

The character of the classified section probably would exclude from it all subscribers except those who use a telephone in the pursuit of their callings, but the defendant undertakes to exclude all other telephones from this section. However, the defendant holds open this section and professes willingness to admit thereto all subscribers to business telephones. In fact, the defendant makes a flat charge for the use of a business telephone which entitles the subscriber to have his name listed once in the alphabetical list of subscribers and once in the classified section as well. We have referred to the fact that an additional charge is made for an extra listing in the classified section, but defendant is evidently quite willing to make such additional listings as the subscriber may desire if the extra charge is paid, (probable limitations by size of the directory and similar considerations are not involved here) and the trial court was authorized to find, and therefore is to be taken as having found, that defendant also professes a willingness to do this. Dr. N. Jay Rogers testified: "A.—they have always been anxious to get our listings and whatever additional advertising as we desired, and they always wanted us to do as much advertising in the yellow pages as we felt we should."

In compiling the classified section the defendant normally accepts the subscriber's description of his occupation as being true; but if the defendant knows that this statement is false, the defendant refuses to list the subscriber in this classification.

The classified directory is a source of revenue to the defendant. In addition to extra listings, there are several hundred advertisements in this section and for these advertisements the defendant charges a fee which is graded according to the space occupied by the advertisement. The defendant solicits such advertisements.

Trade names are abundant in this classified section and these are not limited to commercial concerns. For instance, the medical profession uses them and defendant has provided for this custom by establishing classifications for them. Thus under the title "Clinics—Medical" appear the names of seven clinics. Four of these do not contain the name of any individual; one, for instance, simply reads "Medical Clinic." The names of these clinics are trade names, of exactly the same sort as the one used by the plaintiffs, and perform exactly the same function as does any trade name. We note that under the name of each clinic so listed appear the names of physicians who are, presumably, the persons making up the clinic, and a comparison of these names with those listed under the title "Phys & Surgs—M.D." shows that all except one of these people are also listed under the latter title and that of those so listed six are described as being members of the Jefferson County Medical

Society. However, the clinics to which we have referred are listed only under their own classification and are not listed under the title "Phys & Surgs—M.D." Classifications are provided for three other kinds of clinics. Trade names are also used by chiropractors and we note that defendant lists chiropractors' trade names with the names of individuals who practice chiropractic. Thus under the title "Chiropractors—D.C." appear the names "Parker Clinic" and "Procter Street Health Service." The Parker Clinic is also entered under the title "Clinics—Chiropractors." On the same page bearing its name appears an advertisement by the "Procter Street Health Service" and this lists the name of only one person, from which we infer that this person uses the trade name for the practice of the profession. The name of the individual is not listed under the title "Chiropractor—D.C."

From the nature of optometry we infer that plaintiffs do not operate a clinic. Defendant, however, has not tendered plaintiffs any classification for "Texas State Optical" comparable to that made for clinics.

The directory which is in proof actually prints the listing in the classified section which plaintiffs want and which defendant has since refused to make. That is, under the title "Optometrists" appears "Texas State Optical Co" (plaintiffs have dropped the "Co." from the listing desired) and among the individuals named under this title appear S. J. Rogers, I. E. Davis and H. Smith, beneath whose names appear the words "Texas State Optical, 417 Austin."

The alphabetical list of subscribers also lists "Texas State Optical Co" but does not state the occupation of this concern. The three individuals listed in the classified section as being connected with Texas State Optical are also listed in the alphabetical list of subscribers and are there identified as optometrists.

These listings by Texas State Optical in the Port Arthur directory have been in use by that concern for many years. Dr. N. Jay Rogers testified that he and his brother

had been practicing optometry in Port Arthur under the trade name "Texas State Optical" for about 12 years; and that throughout this period the concern had been a telephone subscriber and had been listed under its name in the classified section of the directory under the title "Optometrists." It had also been listed among the alphabetical list of subscribers during this period. In their request for a listing, plaintiffs asked that "Texas State Optical" be listed under the heading "Opticians", as follows:

"Texas State Optical
417 Austin (see advertisement this classification) Telephone 5-8893"

The individual listings requested under the headings "optometrists" read:

"Davis, I. E.
at Texas State Optical
417 Austin
"Rogers, N. Jay
at Texas State Optical
417 Austin
"Rogers, S. J.
at Texas State Optical
417 Austin
"Smith, H.
at Texas State Optical
417 Austin
"Texas State Optical
417 Austin."

The advertisement referred to in the listing under "Optician" is not in proof but the directory before us contains the following advertisement:

"Dr. I. E. Davis      Dr. H. Smith
Dr. S. J. Rogers      Dr. N. Jay Rogers
Optometrists and Opticians
(Picture of eye glasses appears here)
Eyes Examined              Glasses Fitted
Broken Lenses Duplicated
Complete Optical Service
Oculists' Prescriptions Filled
Artificial Eyes Fitted
Credit if Desired
Texas State Optical
"The Name You Trust"
417 Austin                    5-8893"

The defendant informed plaintiffs that all of these requested listings would be printed except that of Texas State Optical

under the heading of "Optometrists". The reason for the defendant's refusal to continue the practice followed for years is not stated in the evidence, but we infer that defendant acted on the ground that the listing would not be truthful. No complaint has been made by defendant that the directory has become too bulky or too expensive and that such facts imposed a limitation upon the number of names which could be listed in the directory.

The extension of credit is not involved. The plaintiffs have paid the charges assessed against them in the past and are willing to pay those assessed in the future.

Of the various names which plaintiffs have asked defendant to list, the actual telephone subscriber is "Texas State Optical". The names of the individuals to be listed are additional listings and so is the listing of Texas State Optical under the heading "Opticians". The regular listing in the classified section to which Texas State Optical is entitled on paying the rate charged for the telephone itself is the listing under "Optometrists" which the defendant refuses to make.

As we have stated, the plaintiffs are engaged not only in the practice of optometry; they are also engaged in business as opticians; and both occupations are followed at each of their offices under the trade name "Texas State Optical." They maintain offices under their trade name in 13 Texas cities and they employ other optometrists who work in these various offices. The two optometrists other than plaintiffs themselves whom plaintiffs have asked defendant to list are evidently employees who work in plaintiffs' office at Port Arthur.

The trade name "Texas State Optical" is valuable to the plaintiffs. Throughout the years they have practiced their profession under it and have advertised it to the public and, it is to be inferred, are known to the general public by their trade name instead of by their individual names. Dr. N. Jay Rogers testified:

"Q. Doctor, I'll ask you whether or not over the long period of time at Port Arthur you and your brother have built up a large practice in the practice of optometry under the name of Texas State Optical? A. Yes, we have.

"Q. Do you have very many patients, or few? A. Quite a number.

"Q. It has been a successful operation? A. Yes, it has.

"Q. Have you in the past had occasion to publicize the name Texas State Optical as Optometrists throughout this area? A. We have continuously since the time we started our office.

"Q. By what means did you do that, in addition to the telephone book. A. Newspapers, radio stations, various publications of various organizations such as churches and clubs, civic clubs, and billboard advertising, and television, and most all other means of advertising that are common to the every day operation of a business."

There is no evidence that any other optometrist in Port Arthur uses a trade name except, perhaps, the firm "Daniel & Daniel". One member of this firm was an optician, and defendant professed an intention to correct this particular listing in the future. Since plaintiffs practice under their trade name and other listed optometrists do not, it would be no discrimination in favor of plaintiffs and against their competitors for defendant to grant plaintiffs' request.

The plaintiffs' trade name is registered in the assumed records of the county, and plaintiffs' licenses to practice as optometrists are also recorded in the county as required by law.

It does not appear that there has been any interruption of plaintiffs' telephone service in Port Arthur and we infer that Texas State Optical is still the subscriber, in possession of its telephone, and that it is listed as such in the directory except under the heading "Optometrists".

We assume from the number of subscribers in Port Arthur, that the defendant operates the only telephone exchange in Port Arthur.

It was stipulated that the City of Port Arthur had not regulated "the classified

advertising directory business of the defendant."

## Opinion

The fundamental question raised by this appeal is whether plaintiffs have the right to practice their profession under a trade name. If they do, they have the same right to publish it in the defendant's classified directory that they have to publish in that directory the names written on their licenses to practice optometry. We think that they can use the trade name and that they are entitled to a decree directing the defendant to publish this name under the classification "Optometrists" in the classified directory, all for the following reasons:

■ (1) The defendant is a public service corporation. In Western Union Tel. Co. v. Neill, 57 Tex. 283 at page 288 the duties of telegraph companies to their public at common law, independent of statute, were described generally as follows: "As our legislature, however, has delegated to telegraph companies the power to exercise the right of eminent domain, and as their employment is quasi public, they should so far be governed by the law applicable to common carriers that the general duty devolves upon them to serve the public and act impartially and in good faith to all alike * * *." The defendant is under the same duty.

■ (2) This common law duty is limited by the defendant's profession of service, and the extent and limits of this profession are questions of fact. In Oklahoma Natural Gas Co. v. Corporation Commission, 88 Okl. 51, 211 P. 401, 402, 31 A.L.R. 330, the Supreme Court of Oklahoma said: "The authorities are harmonious in holding that one enters the public business by professing or undertaking to serve the public, and that his public obligation is limited by the extent of his profession. * * * So the primary question is what the profession of the appellant necessarily covers; and this is a question of fact, rather than of law." The question in that case concerned the extent of the area which the public service corporation professed to serve, but the principle stated applies as well to the facilities which a public service corporation professes to furnish its customers. Concerning the limitation of the duty to serve to the profession of service see also Interstate Commerce Commission v. Oregon-Washington R. & Navigation Co., 288 U.S. 14, 53 S.Ct. 266, 77 Law.Ed. 588 at p. 603; United Fuel Gas Co. v. Public Service Commission, 105 W.Va. 603, 144 S.E. 723.

■ (3) As a part of the common law duty to serve the public which it professes to serve, and to act impartially and in good faith to all of them alike, the defendant "may not arbitrarily refuse to furnish to a particular person services or facilities which are of the character which it holds itself out to furnish to the public generally, or to the public of the applicant's class." 62 C.J. 84, Sec. 92b (1). Further, defendant "is without right to discriminate arbitrarily or unjustly between different patrons with respect to the character or quality of the services or facilities furnished." 62 C.J. 86, § 94. Thus, in El Paso Elec. Co. v. Raynolds Holding Co., 128 Tex. 495, 100 S.W.2d 97, 101, 108 A.L.R. 744, the court said: "Under the statutes of this state, as well as by principles of common law, defendant was prohibited from discriminating between its customers, situated under like circumstances, either as to the service rendered or the charges made therefor." Regarding equality in the facilities furnished, see: Texas Power & Lt. Co. v. Doering Hotel Co., 139 Tex. 351, 162 S.W. 2d 938; Southwestern Bell Telephone Co. v. Matlock, 195 Ark. 159, 111 S.W.2d 500; Southwestern Bell Telephone Co. v. Lee and Hanna, 200 Ark. 318, 140 S.W.2d 132; State v. Nebraska Telephone Co., 17 Neb. 126, 22 N.W. 237.

■ (4) Our statement of proof shows that telephone directories are furnished to all telephone subscribers as a part of the service rendered them by defendant, and that the classified section is an important part of this directory. Our statement also shows that a listing in this classified section under the proper title is a service which is furnished to all subscribers to business telephones and that this service is also rendered as a part of the telephone service furnished to this group of people by the defendant, whether it be the regular

listing the subscriber is entitled to on paying the regular rate for his telephone or is the additional listing available to him on paying the defendant's fee. See California Fireproof Storage Co. v. Brundige, 199 Cal. 185, 248 P. 669, 47 A.L.R. 811. Stated in terms of profession to serve, the defendant professes to list all business telephones under the classification to which the particular profession belongs and this profession of service includes optometrists.

While the service to the subscribers to business telephones which the classified section of the directory represents is not essential to the use of these subscribers' telephones or to the use of other subscribers' telephones in the sense that the alphabetical list of subscribers is, and while the defendant, for that reason, may not have been under any legal duty to institute this particular service, nevertheless the defendant has elected to provide this service, under the profession of service stated, all for its own benefit, with a virtual monopoly of the service, and the defendant ought now to render this service with the same impartiality as other more necessary services are rendered. See Delaware & A. Tel. & Tel. Co. v. Delaware, 3 Cir., 50 F. 677; Dist. of Columbia v. Chesapeake & Potomac Telephone Co., 86 U.S.App.D.C. 124, 179 F.2d 814, at page 816.

■ (5) Our statement of proof shows that "Texas State Optical" is not a legal entity but is, instead, only a partnership of licensed optometrists who have elected to use a name for their firm, and thus for themselves, which does not include their names instead of a name which does, and that the only other calling in which this firm engages is that of opticians. It shows therefore that a listing of "Texas State Optical" in the classified section under the heading "optometrists" would be a truthful statement. Our statement of proof also shows that to exclude this name of the plaintiffs' firm from the list of optometrists in the classified section is about equivalent to excluding plaintiffs themselves because of plaintiffs' long use of the trade name "Texas State Optical" in the practice of their profession instead of their own; and thus our statement shows that a discrimi-

nation has been made between plaintiffs and other members of their class, namely, their competitors—the other optometrists listed in the classified section of the Port Arthur directory. It shows further that this discrimination is materially harmful to the plaintiffs because of the defendant's virtual monopoly of the service performed by the directory and the unique character and value of the classified section of the directory.

Plaintiffs thus were entitled prima facie to the relief prayed for by them because they showed a right to the desired listing and showed a denial of that right and a harmful discrimination against them. See Southwestern Bell Tel. Co. v. Matlock, 195 Ark. 159, 111 S.W.2d 500; Masterson v. Chesapeake & Potomac Tel. Co., 55 App. D.C. 23, 299 F. 890; California Fireproof Storage Co. v. Brundige, 199 Cal. 185, 248 P. 669, 47 A.L.R. 811. The authorities cited show that apart from matters mentioned hereinafter, the trial court had authority to enforce the common law duty of a public service corporation and to compel the defendant to make the listing. Also, see Nacogdoches Lt. & P. Co. v. Thomas & Richardson, Tex.Civ.App., 138 S.W. 1080; 62 C.J. 86, § 95.

We turn to the Points of Error assigned and to argument advanced by the defendant in support of their refusal to make the listing which plaintiffs want.

■ (6) Point 1 assigns as error that the question "whether the defendant is subject to public regulation in the publication of its 'Classified Telephone Directory' is for legislative determination."

Point 1 is overruled. The subject matter of plaintiffs' suit has not been regulated by any statute of this State nor by any ordinance of the City of Port Arthur, and whether plaintiffs are entitled to the relief awarded them in the trial court and prayed for by them upon final hearing depends upon whether the defendant owed plaintiffs a duty at common law to give them the listing which they requested. We think that the defendant does. The common law duties which we have applied are well established. See 11 Columbia Law Review 514,

616, 743, in addition to authorities already cited.

■ The temporary injunction granted and the permanent injunction prayed for, although controlling future action of the defendant, are not regulations in the sense that a statute would be or that an ordinance fixing a rate at which services are to be rendered would be a regulation. The dispute pending here requires the exercise of judicial power, which has been customarily exercised by the courts until jurisdiction has been vested elsewhere, as has been done in the case of the Interstate Commerce Commission; and legislative power is not involved. Thus, in Great Northern R. Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 479, 66 Law.Ed. 943 at page 946, the court said: "To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function." The injunction, a standard form of relief, operates on an existing condition or state of facts and is judicial in character, as an award of damages for discrimination would be; it is not legislative in character, and it neither prohibits nor interferes with future legislation. Using general terms, the rule of future conduct which the injunction granted prescribes and that prayed for will prescribe is necessarily subject to valid action taken in the future by a body having legislative power, and the injunction will be modified or abrogated should conditions change. This matter is referred to hereinafter and authorities are cited at that point.

■ Article 1119, Vernon's Ann.Civ. Tex.St., does not apply to Port Arthur. It applies only to cities incorporated under general laws. City of Sherman v. Municipal Gas Co., 133 Tex. 324, 127 S.W.2d 193. We take judicial knowledge of the fact that Port Arthur is a home rule city, operating under its own charter.

■ Article 1175, Subdiv. 12, V.A.T.S., does apply to home rule cities; but the authority which it confers is legislative and does not affect this case or the jurisdiction of the trial court. The adjudication of this controversy is a judicial function, not a legislative one, as we have pointed out; and this statute does not confer any judicial jurisdiction upon the city. That is, the statute does not make the city a public service commission, with power to adjudge particular cases of the sort before us. The statute simply authorizes the city to prescribe rules, and the application of such rules to the rights of interested parties necessarily falls to the courts. See Ford v. Rio Grande Valley Gas Co., 141 Tex. 525, 174 S.W.2d 479; Kousal v. Texas Power & Lt. Co., 142 Tex. 451, 179 S. W.2d 283. Whether (as a way of proceeding) this statute requires an interested party to first apply to the city's governing body for the enactment of a rule is a question of what the Legislature intended. Such a requirement would have to be implied here, for it has not been expressly made. But there is no reason for such an implication; it is not needed to carry the city's power to legislate into effect. In this case the City of Port Arthur has not enacted any regulation governing the subject matter of this suit. We are not to be understood as having expressed any opinion about the power of that city to enact such a regulation; but if Port Arthur does have power to do so, what would plaintiffs do if the city's governing body refused to act? No provision for appeal from the city's decision has been made. The enactment of the ordinance, if required, would have to be compelled by suit; but no provision for such litigation has been made, at least expressly. With this question of procedure, affecting the preliminary jurisdiction of the court, there goes another which affects the substantive rights of the parties. This question is whether Article 1175(12) has automatically suspended the common law rules of decision which prescribe and govern the common law duties of the defendant as a public service corporation, and the answer to this question also depends upon what the legislature intended in enacting this statute. Here again, what is the consequence of a

city's failure to act? Or, having had their attention directed to the omission, what if the city's governing body refuses to enact an ordinance? It might do so in the case of a classified directory, for this matter does not much concern the city. The omissions, difficulties and delays suggested indicate that the legislature never intended Article 1175(12) to suspend the common law rules automatically; and we conclude that these rules, that is, those prescribing and governing defendant's duties as a public service corporation, remain in force and effect, to be administered and enforced by the courts until, at least, the city pre-empts the field with a valid ordinance. We conclude, too, that resort to the city for the enactment of a regulation before applying to the court for relief in a particular case was not intended to be required, and the perliminary jurisdiction of the court thus limited. Since Port Arthur has not enacted a regulation governing the subject matter of the suit, there was nothing in the way of the trial court's adjudication of this suit.

The decisions cited by the defendant are not in point. There is no inconsistency between the power of a city to enact a regulation under Article 1175(12), assuming that the statute conferred the power upon the city, and the trial court's power to require the defendant to make the listing which plaintiffs requested. The city's power to regulate is actually not involved; but if by reason of an ordinance by the City of Port Arthur it does become illegal for defendant to make this listing in the future, the injunction granted the plaintiffs will certainly be modified if any application to the court for modification proves necessary. See Uvalde Paving Co. v. Kennedy, Tex.Civ.App., 22 S.W.2d 1091; 28 Am. Jur., 494, § 323, and the Cumulative Supplement; 68 A.L.R. 1180; 136 A.L.R. 765. As a matter of fact, the order appealed from being only a temporary injunction, provision for the effect of future illegality could be made in the trial court's final decree, if that is rendered in plaintiffs' behalf.

(7) Point 2 assigns as error that "the defendant in publishing its 'Classified Telephone Directory'—not performing an essential public service, it is not subject to public regulation with respect thereto." Point 3 assigns as error that "plaintiffs' petition showed as a matter of law that the defendant was under no legal or other obligation to accept and publish advertising matter for the plaintiffs."

These points are overruled for reasons already stated. We add the following comments:

We agree with defendant that defendant can act in a private capacity, as distinguished from the capacity in which it acts as a public service corporation; but the publication of the classified lists of names in the classified section of the directory is not like the sale of surplus products which the people served by a public service corporation do not need, or the renting out of ground space not needed by a carrier to perform its functions. Such acts do not affect the people served, but our statement of proof shows that publication of classified lists of names in the Classified Section of the directory does materially affect persons so listed, and in a way telephone subscribers generally. The defendant's publication of the Classified Section is not analogous to the publication of a newspaper because the defendant is a public service corporation. The following language by the Supreme Court of California in California Fireproof Storage Co. v. Brundige, 199 Cal. 185, 248 P. 669 at page 671, 47 A.L.R. 811, is in point. "We can well conceive that, if the telephone company is to be free of control to select such of its subscribers as it may choose to assess or to favor in this regard, it would be in a position to so juggle with this particular form of advertising as to give a minimum of efficiency to those who did not so advertise, or whom it did not, for any reason, see fit to favor in the foregoing regard, or to discriminate in other respects among its customers, and thus subject this particular instrumentality of its service to serious inequalities and abuses. * * * The employment of this instrumentality of its public service as a means for making such discrimination among its subscribers ought not to be tolerated, and can only be per-

mitted upon the theory that the telephone company, in making use of its directory for advertising purposes, is engaged in a strictly private enterprise, and hence in that respect is not subject to public regulation and control. We cannot subscribe to this theory for the foregoing reasons, but there are also other reasons why we think we ought not to do so. The telephone service in its relation to the public, and in its general and practical operation, is, or at least tends to be, a natural monopoly; and, this being so, it is, in a special sense, the proper subject of public regulation and control."

The argument that the service performed by the Classified Section for persons listed therein can be duplicated elsewhere, so that such persons can protect themselves without appealing to a court, seems to us to be in conflict with the facts. Who can provide an analogous service in competition with this? A telephone subscriber gets the directory for nothing more than the rate paid for his telephone. The subscriber who is listed in the Classified Section has already paid for this service; there is no reason why he should pay for it again. The compilation of the Classified Directory depends upon information which is contained only in the defendant's own records. How would a competitor discover all of the people whose names appear in the Classified Section, and then keep this list up to date as the defendant does? Perhaps this could be done but it looks like an unprofitable job. What else besides a similar publication could compete with the defendant's directory? Not only is it much easier and apparently cheaper for the defendant to compile and publish this directory than it would be for others; the Classified Section is also bound under the same cover with the alphabetical list of subscribers and is thus automatically preserved, conveniently at hand to the telephone and the person using it, for the benefit of all. In truth, the Classified Section and the service it performs is unique and is a virtual monopoly in fact. See District of Columbia v. Chesapeake & Potomac Tel. Co., 86 U.S. App.D.C. 124, 179 F.2d 814. For instances of a virtual monopoly, see Munn v. Illinois,

94 U.S. 113, 24 L.Ed. 77; People v. Budd, 117 N.Y. 1, 22 N.E. 670, 682, 5 L.R.A. 559, 15 Am.St.Rep. 460. We have referred to the value which the classified list has for the ordinary telephone subscriber.

Defendant emphasizes the fact that the Classified Section is not absolutely essential to the use of the telephone; but the significant fact, instead, is the fact that defendant furnishes this directory as a part of its telephone service, under the profession of service to which we have referred.

■ (8) Points 4 and 5 assign as error that defendant's refusal to make the listing of plaintiffs' trade name requested by plaintiffs was proper because the plaintiffs' use of a trade name in the practice of their profession violated that part of Vernon's. Ann.P.C. art. 738a making it a crime for any person to "Falsely impersonate any person duly licensed as an optometrist under the provisions of this Act or to *falsely* *assume* another name."

Points 4 and 5 are overruled. There is no question of impersonation, and that part of the statute relied on by defendant is that prohibiting the false assumption of another name. This part of the statute seems directed at the prevention of something which would mislead. It does not prohibit the simple assumption of a trade name. Instead, it prohibits in terms, an act which is a falsehood; and the plaintiffs have committed no falsehood, nor been guilty of any misrepresentation or concealment. They have recorded their trade name in the "assumed name" records of the county, so that any interested person can identify them with their trade name. They have practiced their profession in Port Arthur under this trade name for 12 years and during this period have publicly listed this trade name in the Classified Section of defendant's telephone directory under the classification "Optometrists." The trade name actually *is* their name, just as the names written on their licenses are their names. We note that in Shugart v. Rogers, Tex.Civ.App., 170 S.W.2d 813, the Dallas Court of Civil Appeals protected Dr. S. J. Rogers, one of the plaintiffs, against an infringement of this trade name in the City of Dallas.

■ The fact that no license to practice optometry has been issued to "Texas State Optical" is not material. This firm is only a partnership and is not a legal entity as a corporation would be. The members of the partnership which "Texas State Optical" designates have complied with the licensing laws and their licenses have been recorded. Anyone who did not know whom "Texas State Optical" referred to would first have to inquire for this information, but he would have to do so the same if plaintiffs used the name "Rogers & Rogers". For no license has been issued to "Rogers & Rogers".

We agree with the defendant and with the amici curiae who have filed a brief for the Texas Optometric Association, Inc., that the practice of optometry is a profession; but it is not, for that reason, against the public interest for plaintiffs to use a trade name so long as the general public have means at hand in the county records by which to discover and identify the persons using the trade name. Only by concealment of membership could a fictitious name such as "Texas State Optical", containing the name of no person, injure the public. The public authorities who are charged with the administration of the laws governing the practice of optometry are not hampered by this trade name. Standards of excellence and the proper professional relationship between optometrist and patient can be kept as high as any *organization* can maintain them, and no body is claiming that partnerships for the practice of optometry are illegal. Knowing the membership of the firm, one still does not know who is employed by the firm, but it is not claimed that the plaintiffs' employment of other optometrists is illegal. We note that the plaintiffs have advertised the names of optometrists employed in their Port Arthur office, at least to the extent of listing them in the Classified Section under the classification "Optometrists".

■ However, the right of a professional man to use a trade name in the practice of his profession has been established at common law by the decisions in Shugart v. Rogers, supra, and Aultz v. Zucht, Tex.

Civ.App., 209 S.W. 475. The first case involved the practice of optometry by one of the plaintiffs and the second case involved the practice of dentistry. We note that the use of such names by dentists has since been prohibited by statute. See Acts 1919, 36th Leg., Ch. 31, § 12 and Acts 1935, p. 606, Ch. 244, Vernon's Ann.P.C.art. 752.

We have mentioned in our statement of proof the use of trade names by the medical profession, evidently with the approval of the membership of that profession. It seems to us that if any organization, either of optometrists or of other persons, having more than four or five members is to be named at all, the size of the organization compels the members to use a trade name of some sort because the names of only a few persons can be conveniently put in the name of the firm. If the plaintiffs have a right to organize themselves into a firm and as such, to practice optometry (and we do not understand that defendant or amici curiae deny that they can), surely they have a right to give their firm a name. Is there really so great a difference, so far as the public interest is concerned, between a name which contains the names of a few members of the organization and one which is purely fictitious, that the courts ought to prohibit the use of the latter on the ground of public policy? We think that the matter is one for regulation by the Legislature.

■ (9) Points 6 and 7 assign as error that plaintiffs' use of the name "Texas State Optical" violates P. C. Article 1554 which makes it a crime for any person, with intent to sell or dispose of any service, to make, publish, disseminate or circulate any advertisement which contains any assertion, representation or statement which is known by said person to be untrue, deceptive or misleading.

Points 6 and 7 are overruled for reasons already stated. If "Texas State Optical" were a corporation defendant's argument would be more persuasive, but it is only an association of individuals. The general public probably interprets "Texas State Optical" as they probably would in-

terpret "Rogers & Rogers", that is, as referring to a place where they could get the services of optometrists.

Point 8 assigns as error that "defendant as a matter of law is entitled to exercise a reasonable discretion over the nature, character and content of requested advertising material" and that there was no evidence that defendant had acted arbitrarily and capriciously in rejecting the listing which plaintiffs requested.

Point 8 is overruled because no basis for the exercise of any discretion has been shown. Defendant's refusal, instead, was proved to be a harmful discrimination against the plaintiffs in favor of persons competing with them. We see no reason why the plaintiffs should not be allowed to list as many names as they lawfully possess and can use.

We agree with defendant that defendant has the right to refuse to publish something which is untrue.

(11) Point 9 reads as follows: "Even assuming that the advertising matter requested by plaintiffs did not constitute a violation of the Laws of the State of Texas, nevertheless, such advertising matter is contrary to the spirit and intent of said laws and the defendant, in the exercise of a reasonable discretion, was justified in rejecting such advertising matter, and consequently the trial court erred in compelling the defendant to accept and publish such requested advertising matter."

Point 9 must be overruled for reasons already stated.

The amici curiae suggest that the statutes regulating the use of assumed names, Articles 5924 to 5927, incl., V.A.T.S. and P.C. Articles 1067 to 1070, incl., apply only to a "business" and do not apply to a "profession". The word "business" sometimes includes "profession" and sometimes does not. See 12 C.J.S., Business, pages 773 and 774. The statutes regulating assumed names, however, were enacted for the benefit of the public, in order that the public might be able to identify the persons using the assumed names. See Paragon Oil Syndicate v. Rhoades Drilling Co., 115 Tex. 149, at page 156, 277 S.W. 1036. The same reason which requires this information to be given about a commercial partnership also requires it to be given about a partnership of professional men. The term "business" in these statutes is therefore to be construed as including "professions". It would be a difficult matter to determine what was and was not a profession in callings not already customarily known as such. We note, for instance, that in stating the characteristics of a profession the amici curiae say: "1. The practice of a profession involves mental and intellectual labor and skill rather than physical or manual labor." This statement does not do full justice to the manual labor and physical skill of surgeons and dentists. The amici curiae say further of professions that: "3. The special education, knowledge and learning is always for the use of, or service to, others —patients or clients—to whom the practitioner owes the high duty of personal professional responsibility. 4. Any profit from practicing must be dependent on the personal qualifications of the practitioner." These statements *ought* to be applicable to opticians and, indeed, to electricians or any highly skilled workman.

These comments adjudicate the Points of Error assigned for reversal. All Points of Error are overruled and the judgment of the trial court is affirmed.